IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

GINO PHARMS,                    *
                                *
        Plaintiff,              *
                                *
        v.                      *         CV 619-060
                                *
NATIONAL CREDIT SYSTEMS, INC.,  *
                                *
        Defendant.              *
                                *

---

**O R D E R**

---

Before the Court is Defendant National Credit Systems, Inc.'s motion for summary judgment. (Doc. 34.)  For the reasons explained below, Defendant's motion is **GRANTED**.


## I. BACKGROUND

This Fair Debt Collection Practices Act ("FDCPA") case is about whether Defendant - a debt collector - failed to report one of Plaintiff Gino Pharms' debts as disputed.  Plaintiff alleges it failed to do so and that he suffered damages as a result, including reputational harm, a degraded credit report and credit score, economic, emotional, general, and statutory damages.  He brings this suit to recover those damages, and Defendant moves for summary judgment.

The factual background of this case is relatively simple. "On September 28, 2018, Plaintiff obtained his Trans Union credit disclosure and noticed Defendant reporting a debt allegedly owed by Plaintiff to Varsity Apartments in the amount of $531.00." (Doc. 36, at 2.)   Varsity Apartments had sold off the debt to Defendant, which was trying to collect, although Plaintiff disputes the debt.   (Doc. 1, at 2.)   When Plaintiff learned Defendant was reporting the debt to Trans Union on November 8, 2020, he disputed the debt by sending a one-sentence letter to Defendant: "I dispute the above accounts that you are reporting on my credit files."   (Doc. 34-8, at 9.)   In the letter, Plaintiff listed "Varsity Apts" as the creditor, the account balance as $531.00, the "Opened Date" as "Jan, 2013," an account number, and the last four digits of his social security number.   (Id.)

In response to Plaintiff's letter (which Defendant describes as "extremely vague," "poorly put-together," and "confounding"), Defendant claims it "marked the Plaintiff's account as disputed – meaning, specifically, that it would be submitted as disputed to the credit reporting agencies."   (Doc. 34-1, at 2.)   Defendant's contemporaneous records show it "[m]arked [the] account . . . for CBR dispute" on December 21, 2018 at 3:20:04 a.m. and commenced its investigation at that time.   (Doc. 34-3, at 2.)   Defendant contemporaneously investigated the dispute, noting at 3:20:09 a.m. that the "Correct Person [had] completed [the] investigation" and

had mailed a validation letter to Plaintiff, evidently finding the debt was due and owing.  (Id.)  Plaintiff states he never received any correspondence from Defendant about the debt, including any validation letter.  (Doc. 36-2, at 2.)  Defendant claims it then resumed its collection activities, although "a cursory review of NCS's account notes reflects that there was no real collection activity in the time-frame between Plaintiff's dispute and the filing of this lawsuit."  (Doc. 34-1, at 2; Doc. 34-2, at 3.)

On January 25, 2019 – two months after disputing the debt – Plaintiff obtained a document via 'Credit Karma,' a third-party vendor, that he asserts reflects his Trans Union credit report.  (Doc. 36, at 2, 4.)  The document ("Karma Report") shows that several third parties – including Capital One Bank ("Capital One") and Exeter Finance Corp. ("Exeter Finance") – made inquiries of Plaintiff's Trans Union credit report on November 18, 2018 and January 8, 2019, respectively.  (Doc. 34-8, at 19-20.)  The Karma Report also shows the Defendant debt, last reported on January 21, 2019, as "Open" and "Placed for collection."  (Id. at 21.)  The Karma Report makes no mention that the debt was disputed.  (Id.)  Notably, the Karma Report also purports to show Plaintiff's Equifax credit report, which does not include any mention of the debt at issue.  (Id. at 11-17.)

Now, Plaintiff claims the Karma Report proves that Defendant failed – in violation of the FDCPA – to communicate to Trans Union

3

that his debt was disputed.  (Doc. 1, at 3.)  He asserts he suffered "pecuniary and emotional damages as a result of Defendant's actions" including a degraded credit report and credit score, economic, emotional, general, reputational, and statutory damages. (Id. at 3-4.)  Defendant seeks summary judgment on these claims, (Doc. 34), and the Court addresses the Parties' arguments below.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation omitted) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. Id. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant

shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17 (citation omitted).  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave the Parties appropriate notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. 35.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. DISCUSSION

In its motion for summary judgment, Defendant makes three arguments.  First, Defendant argues Plaintiff lacks standing to pursue his claim.  (Doc. 34, at 5-9.)  Second, Defendant argues it

is not liable under the FDCPA because (1) the underlying account is due and owing, and (2) Plaintiff has failed to produce sufficient, admissible evidence to substantiate his claims. (Id. at 9-13.)   Third, Defendant argues it is entitled to summary judgment based on the "Bona Fide Error" defense. (Id. at 13-15.) The Court will address each argument in turn.

## A. Standing

First, the Court must determine whether Plaintiff has standing to bring his suit.   Plaintiff bears the burden of demonstrating that he has standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

Standing is an essential, limiting aspect on the power of the federal courts. Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016). Only plaintiffs who "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision" have standing to sue.   Id. at 338 (citing Lujan, 504 U.S. at 560-61)).   "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 339. (internal quotations omitted).   To satisfy the 'concreteness' requirement, the "injury must be 'de facto'; that is, it must actually exist." Id. at 340.   Congress is empowered to define whether a cause of

action exists: "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) (citing Spokeo, 578 U.S. at 340-41). "But even though Congress may elevate harms that exist[ed] in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence"; "Article III standing requires a concrete injury even in the context of a statutory violation." Id. at 2205 (citations and quotations omitted). Indeed, a statutory violation only confers standing if it is also a concrete injury: the "plaintiff[] [must] identif[y] a close historical or common-law analogue for [his] asserted injury." Id. at 2204.

In this context, "[p]laintiffs can show a concrete, or 'real,' harm in two ways. The first is to show that the statutory violation itself caused a harm." Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 926 (11th Cir. 2020). "Such harms can be tangible or intangible." Id. "Tangible harms are the most obvious and easiest to understand; physical injury or financial loss come to mind as examples." Id. Intangible harms, on the other hand, "can also be concrete." Ramirez, 141 S. Ct. at 2204. "Chief among them are injuries with a close relationship to harms traditionally

recognized as providing a basis for lawsuits in American courts." Id. (citation omitted). "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." Id. (citations omitted).

The second way for a statutory violation to constitute a concrete harm is for the Plaintiff to "show[] that [the] statutory violation created a 'risk of real harm.'" Muransky, 979 F.3d at 927 (citing Spokeo, at 578 U.S. at 341). "[T]he risk-of-harm analysis entails a more demanding standard – courts are charged with considering the magnitude of the risk." Id. "That means [courts] evaluate whether the claimed procedural violations . . . entail a degree of risk sufficient to meet the concreteness requirement." Id. (internal quotation marks omitted). "[T]he risk must be 'material,'" meaning "important; essential; relevant"; "conceivable and trifling" risks do not qualify. Id.

Here, Plaintiff argues he has standing based on a number of the above theories. First, he argues Defendant's actions "violated the FDCPA [and] caused credit and emotional damages to Plaintiff." (Doc. 36, at 4.) Second, Plaintiff argues "he suffers a degraded credit report as a result of Defendant's violations." (Id.) Third, Plaintiff argues he was "embarrassed" because his "credit report was pulled by several prospective lenders[,] each of whom saw that the accounts were not marked disputed." (Id.) Fourth, Plaintiff argues "his credit score with these prospective credit

9

grantors was unduly depressed because a disputed debt is not calculated into the FICO score. . . . This reduced his chances [of] getting credit with these prospective lenders, a real concrete harm that befell Plaintiff." (Id.) Plaintiff also alleged he "has suffered economic . . . damages as a result of Defendant's violations of the [FDCPA]." (Doc. 34-7, at 3.)

### 1. Tangible Harm

As an initial matter, several of Plaintiff's alleged injuries are of the 'tangible' variety. However, those alleged injuries – that he suffered economic damages and suffered from "a degraded credit report as a result of Defendant's violations" – fall short of conferring standing. (Doc. 36, at 4.) Plaintiff provides no evidence showing economic harm nor that his credit score was degraded; the only evidence he provides shows that his credit report does not denote his debt as disputed. (Doc. 34-7, at 3; Doc. 34-8.) While he argues "his credit score . . . was unduly depressed because a disputed debt is not calculated into the FICO score," he provides no evidence to substantiate this assertion. (Doc. 36, at 4.) In fact, Plaintiff provides no evidence of what his credit score is and offers no evidence that it was ever depressed; nor does he show that either Exeter or Capital One denied him credit due to an undisputed debt on his credit report. He fails to show any financial harm that actually befell him due to the undisputed debt appearing on his credit report. Without

10

any evidence or expert testimony to substantiate Plaintiff's allegations of tangible harm, he is unable to establish standing via the same. See Lujan, 504 U.S. at 561 ("[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"; at summary judgment, "the plaintiff can no longer rest on such 'mere allegations,' but must set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true." (internal citations and quotations omitted)); see also Foster v. AFNI, Inc., No. 2:18-cv-12340, 2020 WL 1531651, at *3-4 (E.D. Mich. Mar. 31, 2020) (finding no concrete injury for a diminished credit score where the plaintiff failed to adduce direct evidence that her credit score was affected by the lack of a 'disputed' notation, and collecting cases requiring evidence beyond affidavits to support claims of a diminished credit score). This leaves two remaining avenues for Plaintiff to establish standing: intangible harm or the risk of real harm.

2. Intangible Harm

Claims for intangible harms "can be tricky: some [intangible harms] are concrete, some are not." Muransky, 979 F.3d at 926; see also Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 997 (11th Cir. 2020) ("Intangible injuries sometimes qualify as concrete, but not always."). As described above, "questions of whether alleged intangible harms are concrete have an extra wrinkle

11

when the plaintiff's claim stems from the violation of a statute."
Muransky, 979 F.3d at 926.  "Congress' role in identifying and
elevating intangible harms does not mean that a plaintiff
automatically satisfies the injury-in-fact requirement whenever a
statute grants a person a statutory right and purports to authorize
that person to sue to vindicate that right."  Id. at 925 (citation
omitted).  "For that reason, [Plaintiff] [cannot] allege a bare
procedural violation, divorced from any concrete harm, and satisfy
the injury-in-fact requirement of Article III."  Spokeo, 578 U.S.
at 341 (citations omitted).  Rather, in "determining whether an
intangible harm constitutes injury in fact, both history and the
judgment of Congress play important roles."  Id. at 340.  "[I]t is
instructive to consider whether an alleged intangible harm has a
close relationship to a harm that has traditionally been regarded
as providing a basis for a lawsuit in English or American courts."
Id. at 341 (citation omitted).  Congress' judgment, too, is
"instructive and important" because "Congress is well positioned
to identify intangible harms that meet minimum Article III
requirements."  Id.

Here, Plaintiff alleges several intangible harms.  First, he
alleges "Defendant's violations of the FDCPA are sufficient to
confer standing upon Plaintiff."  (Doc. 36, at 5 (citing Robins v.
Spokeo, Inc., 867 F.3d 1108, 1113 (9th Cir. 2017) for the
proposition that "some statutory violations, alone, do establish

12

concrete harm")).  Second, he alleges he suffered emotional harm.
(Doc. 34-7, at 3 ("Plaintiff has suffered . . . emotional . . .
damages"); Doc. 36-2, at 3 (stating that Plaintiff "ha[s] suffered
from stress, anxiety, worry, frustration, and anger as a result of
the Defendant's refusal to correct its reporting of [his]
account").)  Third, he argues he suffered reputational harm.  (Doc.
36-2, at 2 (stating that "prospective lenders have obtained [his]
credit disclosures reflecting the alleged debt without the
notation 'disputed,'" which "embarrassed and humiliated [him]
because [he] was unable to inform these lenders that the account
was disputed and not correct").)  The Court will also consider
Plaintiff's assertion that his credit score was damaged –
considered above as a tangible harm – to be an allegation of
reputational harm.

First, the Court disagrees that Defendant's alleged FDCPA
violation, without more, if sufficient to confer standing on
Plaintiff.  As the Supreme Court affirmed in Ramirez, courts
"cannot treat an injury as 'concrete' for Article III purposes
based only on Congress's say-so."  141 S. Ct. at 2205 (quoting
Trichell, 964 F.3d at 999 n.2).  "Article III standing requires a
concrete injury even in the context of a statutory violation."
Spokeo, 578 U.S. at 341.

Second, regarding Plaintiff's argument for emotional damages,
the Eleventh Circuit has not ruled on whether emotional damages –

without more – constitute the type of concrete injury that affords
standing.   While a recent panel decision implied that emotional
damages can constitute even *tangible* injuries, that decision was
vacated and is currently before the Court *en banc*.   See Hunstein
v. Preferred Collection and Mgmt. Servs., Inc., 17 F.4th 1016 (11th
Cir. 2021), *vacated and reh'g granted* (noting that a "plaintiff
can meet the concreteness requirement . . . [by alleging] a
tangible harm – a category that . . . includes, among other things,
. . . emotional distress.")   That panel cited a Sixth Circuit case
to support its assertion that emotional damage is a tangible harm,
but other circuits disagree – including the Seventh Circuit, which
ruled on the issue in the FDCPA context earlier this year.   Compare
Huff v. Telecheck Servs., Inc., 923 F.3d 458, 463 (6th Cir. 2019)
(noting that the plaintiff "[did] not allege, much less prove,
harm in the flesh-and-blood or dollars-and-cents sense of the term.
By way of examples: . . . [h]e does not suggest that he wasted
time or suffered emotional distress while looking for his linked
information") with Pierre v. Midland Credit Mgmt., Inc., 29 F.4th
934, 939 (7th Cir. 2022) (holding that although the plaintiff
"testified that she experienced emotional distress arising from
her concern about being sued for the debt," "worry, like confusion,
is insufficient to confer standing in this context").   Defendant
also points out a recent unpublished Eleventh Circuit decision for
the proposition that emotional damages such as confusion, fear,

and anxiety are insufficient to confer standing. (Doc. 40, at 7-10 (citing Cooper v. Atl. Credit Fin. Inc, 822 F. App'x 951, 953-55 (11th Cir. 2020) (holding that although the defendants' actions "left [the plaintiff] confused about her statutory rights," "her asserted injury of confusion was 'conjectural' or 'hypothetical' because she has not alleged any actual harms that arose from her confusion . . . . Without more, this asserted injury is insufficient to confer standing" (internal citation omitted).)

Ultimately, the Court need not decide whether Plaintiff's emotional damages alone are sufficient to confer standing, because Plaintiff also alleges reputational harm. (See Doc. 36-2, at 2 (averring that prospective lenders obtained Plaintiff's credit disclosures without the notation 'disputed' which embarrassed and humiliated him"); see also Doc. 36, at 7 ("When a consumer disputes an account[] and it is not flagged as disputed it affects the consumer's . . . reputation and character regarding handling his financial obligations.").) Plaintiff argues these harms confer standing because they were the type of harm Congress intended to address via the FDCPA and they "have a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts – such as . . . reputational harm." (Id. at 10.) Thus, the Court must determine – considering both history and the judgment of Congress – whether the alleged reputational harm confers standing on Plaintiff. Spokeo, 578 U.S. at 341.

Plaintiff argues that both factors weigh in his favor. First, Plaintiff alleges Defendant's alleged FDCPA violations alone were "sufficient to confer standing upon [him]" because "[t]he FDCPA provisions at issue were established to protect [Plaintiff's] concrete interests" – specifically, "preventing the reporting of inaccurate information in consumer credit reports." (Doc. 36, at 5-6.) Analogizing the FDCPA to the Fair Credit Reporting Act ("FCRA"), Plaintiff argues the FDCPA was designed to "ensur[e] that credit reporting agencies report accurate information about consumers," and that Defendant's failure to do so violated the Act. (Id. at 7.)

Congress itself described the purpose of the FDCPA in the law's text: "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). Specifically, Plaintiff brings this suit under § 1692e(8), which creates a statutory violation when a debt collector "[c]ommunicat[es] or threaten[s] to communicat[e] to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). Plaintiff alleges Defendant did exactly that: "Defendant failed or refused to flag the account

reflected by the alleged [d]ebt as disputed." (Doc. 1, at 3.) And since "Congress has specifically targeted 'the failure to communicate that a disputed debt is disputed' as conduct violative of that statute," the Court agrees Plaintiff has pled a statutory violation in contravention of the purpose of the FDCPA. <u>Higgins v. Trident Asset Mgmt., LLC</u>, No. 16-24035, 2017 WL 1230537, at *2 (S.D. Fla. Mar. 28, 2017) (quoting 15 U.S.C. § 162(e)(8)).

Second, Plaintiff argues "the harms [he] asserted . . . have a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts - such as . . . reputational harm." (Doc. 36, at 10.) "These are harms Congress intended to address in the FDCPA." (<u>Id.</u>) Indeed, reputational harms have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. <u>Ramirez</u>, 141 S. Ct. at 2204. Specifically, the reputational harm associated with the tort of defamation is a well-established common law tort. <u>See id.</u> at 2208-09; <u>Spokeo</u>, 578 U.S. at 341-42. In that context, "a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party." <u>Ramirez</u>, 141 S. Ct. at 2208 (citations and quotation omitted). As Plaintiff argues here, he "was unable to inform [Capital One and Exeter] that the account was disputed and not correct" which caused him to suffer "embarrassment and humiliation." (Doc. 36, at 4-5.) Defendant's failure to mark the

debt as disputed communicated that Plaintiff had not disputed the debt even though he had done so; accordingly, Plaintiff's allegations have a 'close relationship' to the common law tort of defamation.

This reasoning closely tracks the Supreme Court's decision in Ramirez, where the Court noted that 1,853 class members had standing to sue under the FCRA when "TransUnion provided third parties with credit reports containing OFAC alerts that labeled the class members as potential terrorists, drug traffickers, or serious criminals." Ramirez, 141 S. Ct. at 2209. Due to TransUnion's actions in that case, those plaintiffs had "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation . . . [which] qualifies as an injury in fact." Id. Based on Plaintiff's evidence here - namely, his letter to Defendant disputing the debt and the Karma Report wherein the dispute was not reported - a reasonable jury could conclude that Defendant provided incorrect information about Plaintiff's debt to a third party (TransUnion). (Doc. Doc. 34-8, at 19-21.) Further, the Karma Report shows this information was further disseminated to at least two potential creditors (Exeter and Capital One). (Id.) This allegation is both (1) a harm Congress intended to address via the FDCPA and (2) closely related to the historical common law tort of defamation. Thus, Plaintiff has established standing to pursue his claim of reputational harm.

3. Risk of Real Harm

Finally, Plaintiff argues he has established standing by showing a risk of real harm. Specifically, he asserts his "credit score with [Exeter and Capital One] was unduly depressed because a disputed debt is not calculated into [his] FICO score. This reduced [his] chances for getting credit with these prospective lenders." (Doc. 36-2, ¶ 11.)

The "risk of real harm can[] satisfy the requirement of concreteness." Spokeo, 578 U.S. at 341. However, as one court recently noted, "the Supreme Court recently questioned whether a risk of harm is enough to show an injury in fact in a suit such as this one that doesn't seek injunctive relief." Tolliver v. Nat'l Credit Sys., Inc., No. 20-cv-728, 2021 WL 4306056, at *2 (W.D. Wis. Sept. 22, 2021) (citing Ramirez, 141 S. Ct. at 2210-11). Indeed, the Supreme Court found it "persuasive" that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm – at least unless the exposure to the risk of future harm itself causes a separate concrete harm." Ramirez, 141 S. Ct. at 2210-11 (alterations omitted). In that case, the Supreme Court found no standing for plaintiffs who failed to "present evidence that [they] were independently harmed by their exposure to the risk [that accompanied an FCRA violation] itself – that is, that they suffered some other injury (such as an

emotional injury) from the mere risk that their credit reports would be provided to third-party businesses." Id. at 2211.

Here, Plaintiff provided evidence showing precisely what the Ramirez plaintiffs lacked. As described above, Plaintiff asserts an emotional injury resulting from the risk that an inaccuracy on his credit report would be provided to third-party businesses. (Doc. 36-2, at 3.) In fact, Plaintiff goes even further: he shows not only a risk that the inaccuracy would be provided to third-party businesses, but that the inaccuracy was, in fact, reported to third-party businesses. (Doc. 34-8, at 19-20.) Unlike in Cooper, Plaintiff has alleged more than simple "confusion about [his] statutory rights." 822 F. App'x at 954. Rather, he alleges he suffered not just "worry," but "stress, . . . frustration, and anger" due to Defendant's actions. (Doc. 36-2, at 3.) And unlike in Tolliver, 2021 WL 4306056, at *3-4, which Defendant cites for the proposition that Plaintiff "has absolutely no reason to believe that his reputation has or will be harmed," Plaintiff shows these third-party potential creditors received the incorrect information, showing a substantial - not trifling - risk of financial harm. (Doc. 40, at 15.) Therefore, Plaintiff's allegations also sufficiently confer standing based on the risk of harm he suffered as a result of Defendant's actions.

Based on all of the above, the Court finds Plaintiff has standing to pursue his claim for an FDCPA violation.

20

## B. Debt Actually Owed

Defendant's next argument for summary judgment is that Plaintiff's "underlying account is due and owing." (Doc. 34, at 9.) Defendant argues "there is no record evidence or plausible explanation that the amounts are not owed by the Plaintiff." (Id.) However, as Plaintiff points out, whether the debt is or was actually due is irrelevant to whether Plaintiff disputed the debt and whether Defendant reported that dispute (as required by the FDCPA). (Doc. 36, at 11-12.) Even if Plaintiff owed the debt and his dispute was invalid, Defendant does not challenge that Plaintiff disputed the debt – thereby raising Defendant's statutory obligation to report the dispute. Because the veracity of Plaintiff's debt is irrelevant to Defendant's statutory obligation to report the debt as disputed, Defendant's argument fails.

## C. Admissibility of Plaintiff's Evidence

Defendant also argues Plaintiff's Karma Report does not constitute a "credit report" and therefore cannot substantiate his claims. (See Doc. 34, at 11 ("Plaintiff does not have any credit reports to substantiate his claims.").) Defendant argues the Karma Report is "not reliable, verifiable, or admissible." (Id. at 2.) It further argues Plaintiff "has failed to produce any admissible evidence that he did not owe the debt at issue." (Id. at 11 n.2

(emphasis omitted).)   In its reply brief, Defendant argues the Karma Report is inadmissible hearsay.[1]  (Doc. 40, at 4-6.)

First, the Court will address Defendant's 'reliability' and 'verifiability' arguments.  At the outset, the Court notes that "otherwise admissible evidence [may] be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996), aff'd sub nom., 520 U.S. 781 (1997).  As Plaintiff argues, the "[Karma Report] can be presented in admissible form. . . . If Defendant challenged the authenticity of the business records [at trial], Plaintiff could call a witness from Credit Karma . . . to authenticate the documents." (Doc. 36, at 13-14.)  This is all that is required of Plaintiff's evidence at the summary judgment stage, so Defendant's argument fails.  See Brantley v. Ferrell Elec., Inc., 112 F. Supp. 3d 1348, 1355 n.2 (S.D. Ga. 2015) ("[T]he law is clear in this circuit that evidence need not be presented in admissible form at summary judgment as long as the evidence would be admissible at trial.")

Second, the Court will address Defendant's 'hearsay' argument.  Defendant cites Federal Rule of Evidence 801 to argue the Karma Report is inadmissible because it comes from a third party - Credit Karma - and not Trans Union, a credit reporting

---

[1] As a general rule, the Court does not consider arguments raised for the first time in a reply brief.  See, e.g., Del-A-Rae v. Effingham Cnty., No. 415-259, 2016 WL 5329610, at *5 (S.D. Ga. Sept. 21, 2016).

agency.  (Doc. 40, at 4-5.)  However, the Advisory Committee Note

to Rule 801(c) explains that "[i]f the significance of an offered

statement lies solely in the fact that it was made, no issue is

raised as to the truth of anything asserted, and the statement is

not hearsay."  FED. R. EVID. 801 advisory committee notes.  In this

case, Plaintiff offers the Karma Report to demonstrate that

"Defendant did not make a statement reporting the account as

disputed."  Sanchez v. Healthcare Revenue Recovery Grp., LLC, No.

16-81579, 2018 WL 2021359, at *4 (S.D. Fla. Mar. 8, 2018)

(citing Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1164

(9th Cir. 2009) ("The evidence is not inadmissible hearsay, as

Gorman does not rely on the credit reports for the truth of the

matter asserted therein; in fact, as he notes, he disputes the

truth of their contents. Instead, Gorman offers them to prove that

no statement noticing the dispute was made.")).  Therefore, while

the Karma Report comes from a third party, Plaintiff does not rely

upon it for the truth of the matter asserted; rather, he "offers

the [Karma] Report to prove that Defendant did not make a statement

reporting the account as disputed."  Sanchez, 2021 WL 2021359, at

*4.  As such, the Karma Report is not hearsay.

## D. Bona Fide Error

Finally, Defendant asserts the affirmative defense of a "Bona

Fide Error."  (Doc. 34, at 13.)  Found in 15 U.S.C. § 1692k(c),

the Bona Fide Error defense provides that "[a] debt collector may

not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." "This defense is an affirmative defense and the debt collector bears the burden of proof." Rusk v. Specialized Loan Servicing, LLC, No. CV418-211, 2020 WL 2772771, at *7 (S.D. Ga. May 28, 2020) (citing Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1271 (11th Cir. 2011)). "Specifically, a debt collector bears a three-part burden of showing that its FDCPA violation (1) was 'not intentional'; (2) was 'a bona fide error'; and (3) occurred despite the maintenance of procedures 'reasonably adapted to avoid any such error.'" Owen, 629 F.3d at 1271 (citing Edwards v. Niagara Credit Sols., Inc., 584 F.3d 1350, 1352-53 (11th Cir. 2011)). "The failure to meet any one of those three requirements is fatal to the defense." Edwards, 584 F.3d at 1353.

Regarding the first showing, Defendant must show "that the violation was unintentional, not that the underlying act was unintentional, such that [Defendant] must establish the lack of specific intent to violate the [FDCPA]." Arnold v. Bayview Loan Servicing, LLC, 659 F. App'x 568, 570 (11th Cir. 2016) (internal quotation marks omitted) (citing Johnson v. Riddle, 443 F.3d 723, 728 (10th Cir. 2006)). Defendant denies making the error in the first instance, outlining the steps it takes to prevent errors and

stating they "were followed in this instance." (Doc. 40, at 17.) Defendant states "that any violation of federal or state law was unintentional and the result of a bona fide error." (Doc. 5, at 4.) Defendant also argues "there can be no serious dispute that if there was an error, . . . it was a bona fide error" and that the evidence shows "a computer error (possibly), and therefore, an error somewhere – but not necessarily with NCS." (Doc. 34, at 15.) Further, Defendant provided the sworn testimony of its Vice President of Operations, Mr. Ron Sapp, stating that "NCS flagged Plaintiff's account for dispute with the credit bureaus" on December 21, 2018. (Doc. 34-2, at 3.) This shows that any error was unintentional, satisfying the first prong of the Bona Fide Error defense.

Regarding the second prong, Defendant must show "its violation of the act was a bona fide error." Arnold, 659 F. App'x at 571 (citing Edwards, 584 F.3d at 1353.) "As used in the [FDCPA], 'bona fide' means that the error resulting in a violation was 'made in good faith; a genuine mistake, as opposed to a contrived mistake.'" Edwards, 584 F.3d at 1353 (citation omitted). "To be considered a bona fide error, the debt collector's mistake must be objectively reasonable." Id. (citing Johnson, 443 F.3d at 729). "[T]he bona fide error defense protects against liability for 'errors like clerical or factual mistakes.'" Prescott v. Seterus, Inc., 635 F. App'x 640, 646 (11th Cir. 2015) (citing Jerman v.

25

Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 587 (2010)).

Here, Defendant argues it was objectively reasonable to rely on its internal processes that accommodate debtor disputes. (Doc. 40, at 17.)   Mr. Sapp stated that "NCS has . . . developed and implemented policies and procedures for noting all activities related to an account.   These policies and procedures are reasonably adapted to ensure that all disputes are promptly and accurately noted in NCS's account management system." (Doc. 34-2, at 5.)   He states that "[i]f a debtor disputes an account or informs NCS to cease contacting them, it is NCS's routine practice to require its employees to note the dispute and/or cease contact requests in the account management system" and avers that Defendant "did so in this case, as its notes reflect."   (Id.)   Indeed, Defendant showed that its contemporaneous account notes indicate it marked Plaintiff's account as disputed, and there is no indication Defendant ever reinstated collection activities or changed the 'disputed' mark on Plaintiff's account.   (Doc. 34-3, at 2.)   Thus, "all of" its "various dispute procedures and trainings . . . "were followed in this matter."   (Doc. 34, at 15.) As noted above, Defendant argues Plaintiff's lack of a consumer report "indicat[es] a computer error (possibly), and therefore, an error somewhere – but not necessarily with NCS."   (Id.)   Mr. Sapp stated that after Plaintiff disputed his debt, "NCS, thereafter,

would verify the account as owed, and continued to mark Plaintiff's account as disputed to the credit bureaus." (Doc. 34-2, at 9.)

After a thorough review of the evidence, the Court agrees with Defendant. Although Defendant does not point to a specific clerical or factual error that led to the alleged FDCPA violation, none of the evidence would permit a jury to find any misdeed of Defendant's to be more than an objectively reasonable mistake, including a computer error that occurred without Defendant's knowledge. While Plaintiff argues "NCS has not demonstrated that its violations resulted from a bona fide error, which is a clerical or factual mistake," the statute creating the Bona Fide Error defense does not include any such express limitation. (Doc. 36, at 15.) Rather, Defendant has demonstrated that any violation it caused was the result of a factual error, not a legal one, and that its actions in this case were objectively reasonable. Thus, the second prong of the Bona Fide Error defense is satisfied.

Finally, the third prong - also known as the "procedures prong" - "involves a two-step inquiry." Marchisio v. Carrington Mortg. Servs., LLC, 919 F.3d 1288, 1308 (11th Cir. 2019) (citing Owen, 629 F.3d at 1273-74). "The first step is whether the debt collector 'maintained' — i.e., actually employed or implemented — procedures to avoid errors." Id. The second step is "whether the procedures were 'reasonably adapted' to avoid the specific error

at issue." Id. "This is a 'fact-intensive inquiry' analyzed 'on a case-by-case basis.'" Id.

The Court has already noted several of Defendant's procedures designed to prevent exactly this type of error. Mr. Sapp explained that "[i]f a debtor disputes an account or informs NCS to cease contacting them, it is NCS's routine practice to require its employees to note the dispute and/or cease contact requests in the account management system." (Doc. 34-2, at 5.) Mr. Sapp described Defendant's regular, "internal policies and procedures," including that "NCS's procedures regarding vetting of accounts are specifically designed to ensure that NCS does not attempt to collect on invalid debt, or, such as the case here, fail to notate an account as disputed where it is, in fact, disputed." (Id. at 5.) Specifically, "[a]fter receipt of the dispute in December 2018, NCS . . . marked the account as disputed with the credit bureaus and launch[ed] an investigation into the Plaintiff's dispute." (Id. at 9.) "NCS, thereafter, would verify the account as owed, and continued to mark Plaintiff's account as disputed to the credit bureaus." (Id.)

This evidence shows that Defendant maintained and implemented procedures to avoid errors, including the specific error alleged in this case: reporting a disputed debt as undisputed to the credit bureaus. This satisfies both steps of the procedures prong. Although Defendant cannot explain why the debt was allegedly not

marked as disputed to Trans Union, it has provided undisputed evidence that its regular procedure includes marking accounts 'disputed' with the credit bureaus and continuing to do so even after verifying the debt. This satisfies the third prong of the Bona Fide Error defense, which entitles Defendant to summary judgment in its favor.

### IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 34) is **GRANTED.** The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 29th day of June, 2022.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA